Thank you, Your Honor. You've got me down at 15, and I think the court had set us at 10. It's 10, correct. 10 is the correct number. 10 is the correct number. I only have 10 minutes of thought, so I appreciate that. May it please the Court, my name is John Seidlitz. I am here before the Court representing Robert Sherman. I appreciate the opportunity to provide oral argument. I think from the bar's side, after reviewing our arguments months and months later, while at the time I thought I had this cogent set of arguments that required no explanation, once I review them, I now understand why the Court has questions. Setting that aside, Mr. Sherman is an SSI case, SSI disability case. He applied for SSI benefits and was denied those benefits. He was asked for benefits beginning February 2009. Ultimately, the hearing in July of 10, and he's denied. At that time, he's a 48-year-old gentleman. Excuse me, counsel. Yes. I did not really understand why there was an absence of substantial evidence on the record as a whole to support the ALJ's finding that Sherman's testimony was not credible to the extent that it was inconsistent with the limited functional capacity determination. The reason I didn't understand that is it looked like several examining and also several treating physicians said that he had poor credibility, self-limiting behavior, unwillingness to cooperate during examinations, and so forth. And I thought, well, that's substantial evidence on the record as a whole. I think that can be. It's not determinative. What exactly was it? I mean, there was one guy who said, one examining doctor said, you know, I sort of intuit that he could do more than he does, something like that. Yes. And there's another guy or maybe it was the same guy who said he went on and he got up when he walked out of the room and got on the table. Right. What else? I think in terms of the case and answering the question about whether or not that's substantial evidence, I think that's evidence of this person's. Wait a minute. I asked you a specific question. Aside from those two, is there other evidence from the doctors saying that he was self-limiting or. . . No, Your Honor. . . or whatever. I think that's it. If I'm going to attack my own case and say what else are there, there was the problem that he had with the narcotic contract where he had signed an agreement with the physician. All right. And he went to another doctor. And he went to another or went to the emergency room and got extra and violated the contract. So I think in terms of the. . . But that's not. . . doesn't go to this. I mean, just Kleinfeld suggested that there was a lot of evidence like that, and I could find those two things. So I'm trying to find is there more than that. No, I think that's it. Wasn't there also evidence he didn't follow up on any of the job opportunities that the unemployment people were finding for him, the rehabilitation people? In terms of that, they had found that he had done the training to get a CDL, and they were complaining that he hadn't gone out to find jobs to do the work. I don't know if that's. . . I don't know if that was evidence that the court relied on or the ALJ relied on. And I think the focus was the fact that. . . He also wouldn't return calls or make appointments. Right. And he has an antipersonality disorder. I mean, and I think what happens is that's a finding by the ALJ. This guy is not maybe the most pleasant person. He doesn't like. . . Well, the ALJ refers to statements by at least one physician that he's cannabis dependent, and his attitude is that he wants to sit around and smoke pot all the time. That was Dr. Mosier. Yes. That was the antisocial personality disorder. I think it was that doctor, and he said, this guy's not depressed, he just likes to sit around, watch TV, get up at noon and smoke pot. He didn't say he was not depressed, but he said, I can't tell whether it's lack of motivation, lack of the willingness to go out of the house and meet people, or depression that's really his limiting factor here. I don't know what it is. I don't know if he just doesn't have motivation or if he's depressed. I don't know why he's there. But I think in terms of the findings of those specific reviewing physicians and the residual functional capacity lies the air, because the ALJ says, in concentration, persistence, and pace, routine jobs are acceptable. Transcript 17. He says that. So he says, based upon the physicians you've just talked about, those are okay. And he says in the opinion that his residual functional capacity, what I just said, is supported by McFarland, 12F and 13F, and Dr. Mosher, the one who found him cannabis dependent and not motivated. But if you go into either McFarland or into Mosher, they both find, at 386, McFarland says he's moderately limited in his ability to maintain attention, concentration for extended periods. So while the ALJ says, I'm considering, he doesn't discount her, I'm considering this is fully in compliance with Dr. McFarland's opinions. He says, but in concentration and persistence and pace, all jobs are acceptable. Dr. Mosher doesn't say precisely what you paraphrased him as saying. He says, diagnosis would include antisocial personality disorder, cannabis dependence, and by history, methamphetamine dependence. He says, depression strikes me as questionable. He doesn't say mixed in. He says questionable, which means he questions it. This doesn't seem like a very happy life, but I think he's basically doing what he wants to do, sit around and smoke pot. On a rule-out basis, we can consider depressive disorder NOS. I don't remember what NOS means. I think a natural consequence of an empty lifestyle, but severity would be no more than mild and certainly not limiting. Was Dr. Mosher a physician? He was a psychologist. He is a psychologist, and he's hired by the administration to examine. And I thought, was he relied upon? He is relied upon because the ALJ says that his findings that concentration, persistence, and pace, all jobs are acceptable, or routine jobs are acceptable. He said that that was consistent with Mosher. The problem is, further in Mosher's records, he talks about the fact that these things, depressive disorder, NOS, he says he will have problems with concentration, persistence, and pace. He expects those with the borderline intelligence, this gentleman had a difficult time getting through 10th grade, and marginal motivation. And so what we have is both Mosher and McFarland have said he has limits with marginal motivation isn't a medical limitation. It's not wanting to work. That's something that often afflicts many of us. It may, but what's the reason for the lack of motivation? And when you look through the records of Mosher, and then later on the doctor that testified at the hearing, what you find is part of his behavior is explained by his antipersonality disorder, antisocial personality disorder. The guy doesn't want to be outside of his comfort zone with his friends, come on over and come to my place and hang around and avoid going out into the public. And so when he's not motivated, is it because he's just lazy and wants to put his feet up and smoke dope? Or is it more likely, or at least as likely, that part of his lack of motivation is his wiring, this antisocial personality disorder. He doesn't want to go out in the public, which I think at least has to be considered by the ALJ when he talks about. Is there any case law about whether antisocial personality disorder is a mental health disability? I thought it basically means that you're antisocial. I can't answer that. I don't think so. I can't answer that. All I utilize it for here is that Dr. Mosher, the hired examining psychologist, says that he suffers from that disorder. He's the one that brought it up. I understand, but I'm wondering whether it helps. I don't know the answer to that. The last thing I'd have, in terms of the residual functional capacity and whether it was appropriate or not, whether the ALJ, I think it's internally inconsistent. Because he said the RFC is consistent with the mental health reviewers, and it simply is not. But Marion Martin was a Ph.D. that testified at the hearing. The defendant's brief at page 15 brings up the fact that she's testifying there, and the judge says, what kind of problems does he have? And at 8788 of the transcript, she says he has moderate limitations in concentration, persistence, and pace. That's not included in the RFC. It's simply not included. What she wrote in her report is mental impairment is not so severe as to prevent all types of work. And she also wrote he was evasive when asked to be more specific. In terms of Dr. Martin or McFarland? Oh, that's ‑‑ I might have gotten the name wrong. I think that was McFarland, Your Honor. And I think what's happening there, I mean, and part of that is we're jumping into the province of the ALJ to decide whether he can work or not. The point is the limitation that she gave. Well, that bears on credibility, too. It does bear on credibility. But the limitation that she gave was not included in the RFC, even though the ALJ said it was included. I'm out of my time. Thank you, counsel. Thank you. We will hear from Mr. Howard. Thank you, Your Honor. Thank you, Your Honors. Michael Howard representing the commissioner as agency counsel. Your Honors, as the questioning indicated, this is a case where different doctors questioned the plaintiff's credibility. And there were actually ‑‑ Two? A total of three, actually, Your Honor. Different doctors questioned plaintiff's credibility. We have the two different examining psychologists, Dr. Hurd, who was the medical doctor examining physical impairments, and Dr. Moser, the psychologist. And then we have ‑‑ In what way did Dr. Moser question his credibility as opposed to ‑‑ I should make that a bit more general. Dr. Moser questioned his overall motivation to work, and I would say the credibility of his disability claim, and made the comments about his lifestyle choice and the use of marijuana. Well, the lifestyle choice is a funny business, because this was medical marijuana, right? He had a prescription. Your Honor, the prescription is not on the record, but it was testified to by him briefly at the hearing. And he was in bad pain. Yes, Your Honor. And I don't want to overemphasize the issue of the lifestyle choice or come across as judgmental. I think that's largely irrelevant to our case. Well, it's in the case. Certainly. I mean, being judgmental of his lifestyle. It's really just going ‑‑ it's just really one of several factors going to his overall motivation to work. When we add this to the fact that he left full‑time employment in 1998. Well, if he was taking an opiate and that made him drowsy and he couldn't work, he wouldn't be saying the same thing, right? That depends on the particular facts of the case, Your Honor. And certainly some very strong opiates can have significant medication side effects. But if Your Honor is asking about the side effects, potential side effects. I'm just saying that there's a protocol in the regs and in the case law for how you deal with side effects of medication. Yes, Your Honor. And absent some reason to think otherwise, that's what we're dealing with here. Yes, Your Honor. However, I would submit that this plaintiff has not argued in the briefing that his, or even today, that his marijuana caused material side effects on his ability to work. And if we look at the actual treatment notes, I'd say that overall we could intuit that, you know, in some cases marijuana might limit someone's ability to work. But we look at the actual psychological records in this case and we have the examination of Dr. Moser and there is a diagnosis of cannabis dependence. The other similar things are this one guy who said something, I think it was Dr. Hurd, said I intuit that he could do more. That's not a very scientific statement. Yes, Your Honor. I think the end of Dr. Hurd's report, he's fairly uncertain about what his abilities to work are. But Dr. Hurd did observe specific behaviors that he's citing to. He discussed the inconsistent use of a cane, the inconsistent portrayal of range of motion in the neck. Which was the inconsistent use of the cane? Dr. Hurd, Your Honor, the examining doctor. And I'd also mention, Your Honor, because during plaintiff's remarks today, there was a discussion of two doctors questioning his credibility. There was actually a third I'd submit and the ALJ cited to this doctor. Who's the third? The name of the third doctor. It's on page 383 of the record for the treatment notice. What's the name of that doctor? I'm misplacing the name at the moment. Oh, I'm sorry. I apologize. Let's call him Dr. Three. Certainly, Your Honor. What do we do with something that's a medication as far as state law is concerned, but it's criminal even to possess it under federal law? Does that count as a side effect of medication preventing somebody from working? Your Honor. For federal purposes? That is a very fair question. I would, because, honestly, because the commissioner has not set out a firm policy on that, I'd be hesitant to commit. I would submit, though, that this case, the facts of this case, simply don't raise marijuana as a significant issue. That's not an argument. What about the third doctor? Certainly, Your Honor. On page 383 of the record is this treatment note, and a plaintiff has come in. And this is the note that you might recall from the briefs where he was taking a nap on the examination table. I don't understand that one. I mean, he apparently was sitting in a chair, and the doctor walked out for a while, and he got on the couch. That's supposed to prove what? Yes, Your Honor. When we look at the actual, the treatment note itself, and we look at the way the doctor is wording it, the doctor is noting that he comes in using a walker, and then he sits in a chair during examination and refuses to perform different maneuvers. And the doctor is referring to this repeatedly as not cooperating, not participating, difficult to evaluate this person's limitations. And the doctor keeps using these terms. And then the doctor notes at the end of that note that when he returns to the room, he says, however, when I come back into the room, essentially I'm paraphrasing. I see that the person has now climbed up onto the examination table and is taking a nap. I would simply submit that. I thought he was using a walker, has to get in bed, right? Certainly, Your Honor. What does it prove? I mean, the other may prove something, but I don't understand what it proves. Well, Your Honor, I would agree that the doctor in that note is not saying this person is clearly malingering. I completely question them.  And so I think that's an example of the fact that he could have been paraphrasing and not participating in the physical examinations and see it as another instance of exaggeration or inconclusive. The fact that he could, when he's tired, my doubt. No, Your Honor. Just given the way the doctor's wording it and referring to the evidence of failure to cooperate or participate during the examination. And there have been past cases of this Court citing to, with approval, claimants who fail to cooperate or participate in their physical examination. So you're telling us to forget about the fact that he got a bad read of the rest of it? Well, I think that that's just part of the context of what's happening, Your Honor. And we're just reading the doctor's treatment. Which doctor was that? Do you know? I'm misplacing the name at the moment. We'll call him Dr. Three. I know. I'd just like to look at the report. I can't look at it if I don't know the name. But in any case, Your Honor, this other treatment note, which the ALJ did cite, it's not crucial to the decision. We have the reports of the two examining psychologists and several other reasons to question this individual's credibility. As some of the questioning referred to, we have the poor work history, the failure to cooperate with vocational rehabilitation. Well, the vocational rehabilitation reports, they didn't say he failed to cooperate. I mean, well, they didn't say he failed to cooperate because he didn't want to cooperate. I mean, they basically, ultimately, he did look for jobs. He said, I want a job. And he, but apparently, I mean, most of the jobs, they didn't refer him or the jobs didn't work. And then they discharged him because he couldn't, it wasn't working. As I recall, Your Honor, there was a failure to follow through with some of the jobs, and his case through vocational rehabilitation was dismissed. But in any event, there are these several reasons. And one of the reasons that I want to touch on that hasn't been touched on yet in the remarks today is that we don't have a treating doctor giving limitations on this individual's ability to work. This is not a case where his treating doctor is saying, no, this individual cannot work. He has to lie down the entire workday. He's disabled. So this is not one of those cases where the ALJ is having to essentially go at war and disagree with a treating physician. I think that's actually a very important factor in both the sense of looking at credibility and also the issue of this medical opinion evidence that has been raised, which I think is less clear. I do want to touch on, since I do only have a couple minutes remaining, I do want to touch on a couple arguments Plaintiff has made about different psychologists and how their limitations were not accounted for in the residual functional capacity finding. And I think that this is very clearly incorrect. Plaintiff was referring to a non-examining physician, Dr. McFarland, and he referred to page 386 of the record and some moderate limitations. If you look at the actual form that Plaintiff is citing on that page, that is the first page of standard agency form. And at that page, it's essentially concerned with step three instead of the sequential evaluation process, which is listings, and it's not concerned with determining an RFC, the residual functional capacity. Basically what Plaintiff is doing is citing the wrong page of the form. You flip a couple pages further, and the doctor himself, Dr. McFarland, says this person can do unskilled work, and there's certain specific limitations he gives that are consistent with the residual functional capacity. So essentially he's misreading the form, and also the way the agency by regulation assesses mental impairments. These moderate limitations that the medical expert, which Plaintiff referred to, was referring to, are similarly relevant at step three of the sequential evaluation process, and then you have to translate them into what the person can actually do in the workplace. The agency's regulation that says what the residual functional capacity is, to paraphrase it, says this finding is the most you can do in the workplace. So naturally that would be what tasks can you do in the workplace. Unless the Court has further questions, I would simply ask the Court to affirm. No further questions. Thank you, Counsel. The case just argued will be submitted for decision.
judges: O'scannlain, Kleinfeld, Berzon